UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
CARMELO SANFILIPPO,

                    Plaintiff,

                - against -

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.
--------------------------------------------------------------X

**<u>MEMORANDUM AND ORDER</u>**
14-CV-3067 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

Plaintiff Carmelo Sanfilippo, proceeding *in forma pauperis*, brings this action against defendant Carolyn Colvin, Acting Commissioner of the Social Security Administration (the "Commissioner"), pursuant to 42 U.S.C. § 405(g), seeking review of defendant's determination that Sanfilippo is not entitled to disability insurance benefits under Title XVI of the Social Security Act. Sanfilippo and Colvin have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Pl.'s Mot. J. Pls. (Doc. No. 18); Def.'s Mot. J. Pls. (Doc. No. 20).) For the reasons set forth below, Sanfilippo's motion is granted in part and denied in part and the Commissioner's motion is granted in part and denied in part. The ALJ's decision is reversed and the matter remanded.

## BACKGROUND

### I.    Procedural History

On March 24, 2011, plaintiff Carmelo Sanfilippo filed an application for Supplemental Security Income benefits with the Social Security Administration. (Admin. R. (Doc. No. 23) at 90.) Sanfilippo alleged that he had become unable to work as a result of his disability – major

depressive disorder – as of October 6, 2008. (*Id*.) Sanfilippo's application was denied on July 27, 2011. (*Id*. at 93.)

The Social Security Administration held a hearing before Administrative Law Judge ("ALJ") Mark Solomon on October 10, 2012. (*Id*. at 70, 125.) Sanfilippo was present with counsel. (*Id.* at 68–89.) After Sanfilippo and an impartial vocational expert testified, ALJ Solomon determined that Sanfilippo was not disabled between March 24, 2011 and November 27, 2012. (*Id*. at 52–63, 73, 86.) In January 2013, Sanfilippo requested review by the Appeals Council of the ALJ's decision. (*Id*. at 50.) The Appeals Council denied the request for review on March 31, 2014. (*Id.* at 1.)

Sanfilippo filed the present action on May 15, 2014. (Compl. (Doc. No. 1).) Pursuant to Federal Rule of Civil Procedure 12(c), the parties cross-moved for judgment on the pleadings. (Pl.'s Mot. J. Pls.; Def's Mot. J. Pls.) Sanfilippo asserts that (1) the ALJ failed to follow the treating physician rule by improperly weighing the evidence of Dr. Nidhiry, (2) the ALJ failed to properly evaluate Sanfilippo's credibility, (3) the Appeals Council failed to adequately consider new and material evidence, and (4) the ALJ relied on flawed vocational expert testimony. (Mem. Supp. Pl.'s Mot. J. Pls. ("Pl.'s Mem.") (Doc. No. 19) at 9, 16, 19.) In response, Colvin argues that the ALJ properly found that Sanfilippo was not disabled through November 27, 2012. (Def.'s Mem. Supp. Mot. J. Pleadings ("Def.'s Mem.") (Doc. No. 21) at 13.) The Court finds the ALJ failed to follow the treating physician rule with respect to the opinion of Dr. Nidhiry, failed to properly evaluate Sanfilippo's credibility, and improperly relied on flawed vocational expert testimony.

## II. Non-Medical Evidence

Sanfilippo, born in 1969, was forty-one-years-old when he applied for disability benefits. (Admin. R. at 73, 206.) He attended school through eleventh grade and later earned his GED. (*Id.* at 73, 351.) Sanfilippo last worked in 2005 as a plumber's assistant. (*Id.* at 73–74.) He got the job through his cousin without any special training. (*Id.* at 74.) He testified that his cousin taught him how to do basic plumbing tasks, but he frequently forgot the instructions. (*Id.* at 84–85.) Prior to his work as a plumber's assistant, Sanfilippo installed office cubicles for approximately three months. (*Id.* at 74–75.) Sanfilippo testified that he could not continue that line of work because he was unable to wake up in the morning and could not remember what to do at work. (*Id.* at 75.)

At the time of his hearing, Sanfilippo had lived with his father for approximately fifteen years. (*Id.* at 76.) He states that he has three siblings, whom he sees when they come to his father's house. (*Id.* at 83.) Sanfilippo testified that his father prepares his meals, but they go grocery shopping together. (*Id.* at 77–78.) Sanfilippo also testified that he does his own laundry, sometimes cleans the floors, and can sometimes use public transportation by himself, but that he frequently has anxiety attacks when he is around groups of people. (*Id.* at 77.) He stated that he sometimes has problems getting along with people, especially when he suspects they are talking about him. (*Id.* at 80–81.)

Sanfilippo testified that he has a general daily routine. (*Id.* at 81.) On a typical day, he wakes up, washes his face, has breakfast, gets dressed, and goes for a forty-five minute walk alone. (*Id.*) Afterwards, he takes his medication and either takes a nap or watches television. (*Id.*) He testified that he can generally follow a television show plot if he can understand what is going on. (*Id.* at 82.) He then stated that he generally spends the rest of his day sitting, napping,

or walking around.  (*Id.*)  He also asserted that if he takes his medication in the morning he becomes too tired to do anything.  (*Id.* at 85.)

### III.  Relevant Medical Evidence[1]

### a.  Evidence Before the ALJ

### i.  SEL Medical Group – Theresa Nidhiry, M.D.

Sanfilippo was treated by Dr. Theresa Nidhiry at SEL Medical Group.  Despite Sanfilippo's counsel and the ALJ's efforts to obtain Dr. Nidhiry's treatment notes, they were not provided until after Sanfilippo's hearing.  The following evidence reflects what was available to the ALJ at Sanfilippo's hearing.

Sanfilippo was first treated on November 3, 2010 for major depressive disorder.[2]  (*Id.* at 333–40.)  According to a form completed the same day, Sanfilippo complained he was depressed and lacked energy.  (*Id.* at 304.)  Dr. Nidhiry performed a mental status exam and found that Sanfilippo had a depressed mood, restricted affect, and pressured speech.  (*Id.* at 301.)  She further found that Sanfilippo had a normal appearance, normal activity levels, and adequate impulse control.  (*Id.*)  Dr. Nidhiry diagnosed depression and prescribed Seroquel.  (*Id.* at 302–03.)

In a Treating Physician's Wellness Plan Report form dated January 10, 2011, Dr. Nidhiry diagnosed depressive disorder, noting symptoms of depression, irritability, self-isolation, decreased energy, and psychosis.  (*Id.* at 242–43.)  Dr. Nidhiry checked boxes indicating that Sanfilippo was compliant with treatment and wrote that he was now taking Seroquel and

---

[1] Because significant portions of the medical evidence are illegible, the Court relies, in part, on the parties' interpretations of such evidence.  Inconsistencies between the parties' interpretations are noted.

[2] Sanfilippo states the initial treatment date was November 15, 2010, at which time he was prescribed Zyprexa and Vistaril.  (Pl. Mem. L. at 5 (ECF Pagination).)  While the treatment notes confirm this date and prescription, such evidence was not incorporated into the record until after the ALJ's decision.  (Admin. R. at 356.)

Cymbalta.  (*Id.* at 242.)  Finally, she checked a box indicating that Sanfilippo would be "unable to work for at least 12 months."  (*Id.* at 243.)

In a letter dated June 21, 2011, Dr. Nidhiry repeated her findings.  (*Id.* at 306.)  She stated she was treating Sanfilippo for depression and had prescribed Seroquel and Cymbalta.  (*Id.*)  Again, she indicated that Sanfilippo would be unable to work for at least one year.  (*Id.*)  She further wrote that she believed he was eligible for disability.  (*Id.*)

Dr. Nidhiry completed a Psychiatric/Psychological Impairment Questionnaire form on September 13, 2012, indicating that she had examined Sanfilippo the previous day, September 12, 2012.  (*Id.* at 333.)  Her clinical findings included: poor memory, sleep disturbance, personality change, mood disturbance, emotional lability, delusions or hallucinations, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased energy, and generalized persistent anxiety.  (*Id.* at 334.)  She noted Sanfilippo's primary symptoms as: depression, anxiety, insomnia, social isolation, difficulty concentrating, poor memory, anhedonia, low energy, and withdrawal.  (*Id.* at 335.)

Regarding understanding and memory, Dr. Nidhiry found that Sanfilippo was: moderately limited in his ability to remember locations and work-like procedures; markedly limited in his ability to understand and remember one or two step instructions; and markedly limited in his ability to understand and remember detailed instructions.  (*Id.* at 336.)  Regarding sustained concentration and persistence, Dr. Nidhiry found that Sanfilippo was: moderately limited in his ability to carry out simple one or two step instructions; markedly limited in his ability to carry out detailed instruction; markedly limited in his ability to maintain attention and concentration for extended periods; moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; moderately

limited in his ability to sustain ordinary routine without supervision; markedly limited in his ability to work in coordination with or proximity to others without being distracted by them; moderately limited in his ability to make simple work related decision; and markedly limited in his ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods. (*Id.* at 336–37.)  Regarding social interactions, Dr. Nidhiry found that Sanfilippo was: moderately limited in his ability to interact appropriately with the general public; moderately limited in his ability to ask simple questions or request assistance; moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors; moderately limited in his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; moderately limited in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (*Id.* at 337.)  Regarding adaptation, Dr. Nidhiry found that Sanfilippo was: markedly limited in his ability to respond appropriately to changes in the work setting; moderately limited in his ability to be aware of normal hazards and take appropriate precautions; markedly limited in his ability to travel to unfamiliar places or use public transportation; and markedly limited in his ability to set realistic goals or make plans independently.  (*Id.* at 337–38.)

Dr. Nidhiry diagnosed depression and generalized anxiety disorder and prescribed Seroquel, Cymbalta, and Atarax.  (*Id.* at 333, 338.)  She estimated that Sanfilippo's impairments would last at least twelve months and found that Sanfilippo was not a malingerer.  (*Id.* at 339.)  She noted that Sanfilippo was incapable of even "low stress" work, explaining that he had a "low stress tolerance" and that "stressful situations may increase [his] symptoms."  (*Id.* at 339.)

Finally, she estimated that Sanfilippo would be absent more than three times a month due to his psychological impairments.  (*Id.* at 340.)

## ii.  SSA Consultative Examiner – Michael Alexander, Ph.D.

On July 20, 2011, Dr. Michael Alexander, Ph.D. performed a consultative exam on Sanfilippo and completed a Psychiatric Evaluation form.  (*Id.* at 307–10.)  Sanfilippo arrived to the evaluation with his father.  (*Id.* at 307.)  He informed Dr. Alexander that he had not worked for the past five years due to depression.  (*Id.*)  He explained that he had been hospitalized for depression around the time he stopped working as a plumber's assistant.  (*Id.*)  Sanfilippo also reported seeing mental health professionals on and off over the past five years.  (*Id.*)  He stated that he was currently seeing a psychiatrist once a month at an outpatient clinic, as he had for the past six months.  (*Id.*)  He disclosed that he was taking Cymbalta and Seroquel.  (*Id.*)

Regarding his current ability to function, Sanfilippo reported that he had normal appetite and sleep pattern while on his medication.  (*Id.*)   He reported "a history of dysphoric mood, intermittent feelings of hopelessness, and fatigue since he was in his 30s."  (*Id.*)  He further reported that his medication significantly reduced his symptoms.  (*Id.*)  Dr. Alexander wrote that there was "no evidence of panic or manic related symptoms, thought disorder, or cognitive deficit."  (*Id.*)

Dr. Alexander performed a mental status examination, finding that Sanfilippo "presented as a cooperative, friendly, and alert male.  His manner of relating and social skills were adequate."  (*Id.* at 308.)  The examination revealed no abnormalities and Dr. Alexander diagnosed Sanfilippo with depression.  (*Id.* at 308–09.)  Dr. Alexander found that Sanfilippo's psychiatric condition was "sufficiently controlled and in itself does not significantly interfere with [his] ability to function on a daily basis."  (*Id.* at 309.)

### iii. Medical Consultant – J. Belsky, Ph.D.

On July 26, 2011, Dr. J. Belsky, a psychiatrist and state agency medical consultant, reviewed the medical record and completed a Psychiatric Review Technique form. (*Id.* at 313–26.) On the Section 12.04 "Affect Disorders" page, Dr. Belsky checked a box indicating that "[a] medically determinable impairment is present that does not precisely satisfy the diagnostic criteria [required] . . . ." (*Id.* at 316.) On the Section "'B' Criteria" page, Dr. Belsky marked that Sanfilippo had: a mild degree of limitation in his activities of daily living; a moderate degree of limitation in maintaining social functioning; a moderate degree of limitation in maintaining concentration, persistence, or pace; and one or two repeated episodes of deterioration, each of extended duration. (*Id.* at 323.) Dr. Belsky did not explain his findings in the "Consultant's Notes" page. (*Id.* at 325.)

Dr. Belsky also assessed Sanfilippo's mental residual functional capacity ("RFC"). (*Id.* at 327.) Regarding understanding and memory, Dr. Belsky found that Sanfilippo was: not significantly limited in his ability to remember locations and work-like procedures; not significantly limited in his ability to understand and remember very short and simple instructions; and moderately limited in his ability to understand and remember detailed instructions. (*Id.*) Regarding sustained concentration and persistence, Dr. Belsky found that Sanfilippo was: not significantly limited in his ability to carry out very short and simple instructions; moderately limited in his ability to carry out detailed instruction; moderately limited in his ability to maintain attention and concentration for extended periods; not significantly limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; not significantly limited in his ability to sustain ordinary routine without supervision; not significantly limited in his ability to work in coordination with

or proximity to others without being distracted by them; not significantly limited in his ability to make simple work related decisions; and moderately limited in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.* at 327–28.) Regarding social interactions, Dr. Belsky found that Sanfilippo was: moderately limited in his ability to interact appropriately with the general public; not significantly limited in his ability to ask simple questions or request assistance; moderately limited in his ability to accept instructions and respond appropriately to criticism from supervisors; not significantly limited in his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; not significantly limited in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (*Id.* at 328.) Regarding adaptation, Dr. Belsky found that Sanfilippo was: moderately limited in his ability to respond appropriately to changes in the work setting; not significantly limited in his ability to be aware of normal hazards and take appropriate precautions; not significantly limited in his ability to travel to unfamiliar places or use public transportation; and not significantly limited in his ability to set realistic goals or make plans independently of others. (*Id.*) Dr. Belsky concluded that Sanfilippo could perform tasks in low stress settings. (*Id.* at 329.)

### b.  Evidence Submitted to the Appeals Council

As described below, Sanfilippo submitted additional medical documentation to the Appeals Council, which found that the evidence "d[id] not provide a basis for changing the Administrative Law Judge's decision." (*Id.* at 2.) Additionally, the Appeals Council found that the majority of the submissions were "new information . . . about a later time." (*Id.*)

### i. SEL Medical Group – Treatment Notes

Sanfilippo submitted previously excluded treatment notes and an Initial Psychological Assessment form from SEL Medical Group to the Appeals Council, which were formally included in the administrative record.  (*Id.* at 343–59.)  These notes are handwritten by Dr. Nidhiry and M. Terrie Stewart, a licensed master social worker.  The notes are largely illegible, however some additional information can be gleaned.

The treatment notes confirm that Sanfilippo went to SEL Medical Group for medication management and that he tolerated the medication well.  (*Id.* at 343–48, 352–56.)  One note includes a mental status examination, finding that Sanfilippo had a depressed mood and no suicidal or homicidal ideations.  (*Id.* at 352.)

The Initial Psychological Assessment form was completed by LMSW Stewart on September 2, 2011.  (*Id.* at 349–51.)  The form indicates that Sanfilippo was referred to SEL Medical Group from Arbor WeCARE for psychiatric treatment.  (*Id.* at 349.)  The Assessment confirms that Sanfilippo completed school through the eleventh grade and states that he was placed in special education classes in third grade.  (*Id.* at 351.)  It details his 2007 hospitalization for depressive symptoms following a suicide attempt and his subsequent counseling at Neighborhood through 2008.  (*Id.* at 350.)  A mental status exam revealed Sanfilippo was adequately groomed and dressed, cooperative, could relate well, had adequate impulse control, and was alert.  (*Id.* at 351.)  He was diagnosed with depressive disorder, generalized anxiety disorder, and a history of alcohol abuse, in remission.  (*Id.*)

### ii. Evidence Not Formally Included in the Administrative Record

Sanfilippo submitted the following documentation, which was not formally included in the administrative record because the Appeals Council considered it unrelated to the period of

time at issue: records from Arbor WeCARE; a letter from Dr. Nidhiry, dated January 10, 2014; a

Psychiatric/Psychological Impairment Questionnaire form completed by Dr. Ronald Sherman

and a letter summary of his findings completed June 28, 2013. While the Court finds that some

of this information does concern the period of time at issue, the evidence is largely duplicative of

the information already before the ALJ.

Dr. Sherman's Psychiatric/Psychological Impairment Questionnaire form and letter is

similar to the other psychological evaluations in the record. After a single consultative exam, Dr.

Sherman diagnosed Sanfilippo with major depressive disorder with psychotic features,

generalized anxiety disorder, intermittent explosive disorder, learning disability, attention deficit

with hyperactivity and childhood onset, and high cholesterol. (*Id.* at 37, 46–47.)

Dr. Sherman found a higher degree of limitations than Dr. Nidhiry and Dr. Belsky.

Regarding understanding and memory, Dr. Sherman found that Sanfilippo was: markedly limited

in his ability to remember locations and work-like procedures; markedly limited in his ability to

understand and remember one or two step instructions; and markedly limited in his ability to

understand and remember detailed instructions. (*Id.* at 40.) Regarding sustained concentration

and persistence, Dr. Sherman found that Sanfilippo was: markedly limited in his ability to carry

out simple one or two step instructions; markedly limited in his ability to carry out detailed

instruction; markedly limited in his ability to maintain attention and concentration for extended

periods; markedly limited in his ability to perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerance; markedly limited in his ability to sustain

ordinary routine without supervision; markedly limited in his ability to work in coordination with

or proximity to others without being distracted by them; moderately limited in his ability to make

simple work related decisions; and markedly limited in his ability to complete a normal

workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number of rest periods.  (*Id.* at 40–41.)  Regarding social interactions, Dr. Sherman found that Sanfilippo was: moderately limited in his ability to interact appropriately with the general public; moderately limited in his ability to ask simple questions or request assistance; markedly limited in his ability to accept instructions and respond appropriately to criticism from supervisors; markedly limited in his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; moderately limited in his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (*Id.* at 41.)  Regarding adaptation, Dr. Sherman found that Sanfilippo was: markedly limited in his ability to respond appropriately to changes in the work setting; moderately limited in his ability to be aware of normal hazards and take appropriate precautions; moderately limited in his ability to travel to unfamiliar places or use public transportation; and markedly limited in his ability to set realistic goals or make plans independently.  (*Id.* at 41–42.)

Dr. Sherman concluded that Sanfilippo was totally disabled and unable to function in any job in any capacity.  (*Id.* at 47.)  He noted that he believed the present degree of severity of Sanfilippo's mental illness had existed since April 11, 2011.  (*Id.*)

## IV.    The Administrative Proceedings

On October 10, 2012, ALJ Solomon presided over Sanfilippo's social security hearing.  Sanfilippo took the train with his father to appear at the hearing.  (*Id.* at 77.)  There, he was represented by counsel.  (*Id.* at 68–89.)  Sanfilippo and impartial vocational expert Melissa Fass Karlin testified.  (*Id.*)

### a. Sanfilippo's Testimony

Sanfilippo testified that he had good and bad days.  (*Id.* at 77.)  He stated that he saw Dr. Nidhiry once a month and had previously seen a therapist before his medical public assistance was cut.  (*Id.* at 78.)  He testified that he was taking daily medication for his psychiatric condition, which caused him dry mouth, diarrhea, and "waking up very tired."  (*Id.* at 78–79.)  However, he was able to sleep and eat regularly on the medication and indicated that it seemed "to help a little."  (*Id.* at 79.)  Sanfilippo estimated that he has one anxiety attack per week, during which he has problems breathing, his chest hurts, and he feels like he can't function.  (*Id.* at 80.)  With his medication, Sanfilippo reported the attacks only last for ten to fifteen minutes. (*Id.*)

Sanfilippo also testified that he sometimes hears things at night.  (*Id.* at 85.)  He stated that if he doesn't take his medication and can't sleep, he will "start hearing things in the house like [he] think[s] there's somebody in the house."  (*Id.*)  However, he reported that when he takes his medication, he sleeps through the night.  (*Id.*)

In response the ALJ's questioning about what causes him stress, Sanfilippo responded that he gets "nervous a lot" from not knowing what to do, [being] afraid of hurting somebody, [and] . . .forget[ting] to do things."  (*Id.* at 82–83.)  In response to questions about his memory and focus, he responded that he could focus for five to ten minutes at a time and had trouble with written instructions.  (*Id.* at 83.)  He explained that he sometimes "ha[s] problems understanding how to read [instructions] or if [he can] read it [than he has] problems understanding how to do it."  (*Id.* at 83–84.)  However, if someone showed him how to do something then he would "probably be able to do it . . . or forget."  (*Id.* at 84.)

### b. The Vocational Expert's Testimony

Impartial vocational expert Melissa Fass Karlin also testified at Sanfilippo's hearing. (*Id.* at 86–88.) She described his past relevant work as that of a "plumber helper, which is heavy, semi-skilled work." (*Id.* at 86.) Karlin testified that Sanfilippo could no longer do such work. (*Id.*)

The ALJ then posed a hypothetical involving an individual of Sanfilippo's age, educational and work experience, with the following exertional and non-exertional limitations: "He can remember and understand and carry out simple instructions, make simple work-related decisions, maintain attention and concentration for []rote work, can maintain a regular schedule, and could do a job that involves no contact with the general public, and a job not requiring assembly line production quotas." (*Id.* at 86–87.) Karlin testified that such an individual would be able to perform work as a cleaner, a kitchen helper, and as a meat clerk. (*Id.* at 87.) Karlin testified that there were 53,197 jobs as a cleaner in the local economy and 1,067,857 nationally. (*Id.*) Karlin testified that there were 4,292 jobs as a kitchen helper in the local economy and 273,633 nationally. (*Id.*) Karlin testified that there were 2,863 jobs as a meat clerk nationally and 85,909 nationally. (*Id.*)

The ALJ next posed a hypothetical with the following limitations, as submitted by Sanfilippo's doctor:

> [T]he claimant would have no useful ability to remember and understand one or two-step instructions, no useful ability to maintain attention and concentration for extended periods, lack the ability to work in coordination with or in proximity to others without being distracted by them, the ability to complete a normal workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.
> Would also lack the ability to set realistic goals or make plans independently, would be unable to perform even low stress jobs and would be expected to be absent more than three times a month.

(*Id.* at 87–88.) Karlin testified that this hypothetical claimant would not be able to work. (*Id.* at 88.) She also testified that if the claimant were only limited to being absent from work more than three times a month, he would be precluded from employment. (*Id.*) Karlin then confirmed that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (*Id.*)

### c. The ALJ's Decision and the Appeals Council's Review

On November 27, 2012, the ALJ issued a decision finding that Sanfilippo "has not been under a disability within the meaning of the Social Security Act since March 24, 2011." (*Id.* at 55.) The ALJ found that despite Sanfilippo's severe impairment – major depressive disorder – he still had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, with the following non-exertional limitations:

> Claimant can remember, understand, and carry out simple instructions, make simple work-related decisions, maintain a regular schedule, maintain attention and concentration for rote work, and can perform jobs with no contact with the general public and not requiring assembly line production quotas.

(*Id.* at 57–58.) The ALJ found that while Sanfilippo could not perform his past work as a plumber's assistant, there were still jobs in the national economy that he could perform. (*Id.* at 61.)

On March 31, 2014, the ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Sanfilippo's request for review. (*Id.* at 1.)

### STANDARD OF REVIEW

### I. Review of Denial of Social Security Benefits

The Court does not make an independent determination about whether a claimant is disabled when reviewing the final determination of the Commissioner. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Court "may set aside the Commissioner's

determination that a claimant is not disabled only if the [ALJ's] factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmerman v. Colvin*, No. 13-CV-241, 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply, however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case, [an ALJ's] failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

## II.      Eligibility for Disability Benefits

To qualify for disability insurance benefits, an individual must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(2)(A). This requires a five-step analysis for determining whether a claimant is disabled:

[1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

[2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

[3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.

[4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

[5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner for the fifth step. *See Talavera*, 697 F.3d at 151.

## DISCUSSION

In support of his motion for judgment on the pleadings, Sanfilippo argues that (1) the ALJ failed to follow the treating physician rule; (2) the Appeals Council failed to adequately consider new and material evidence; (3) the ALJ failed to properly evaluate Sanfilippo's credibility; and (4) the ALJ relied on flawed vocational expert testimony. (Pl.'s Mem at 9, 16, 19.)

## I.     The Treating Physician Rule

The regulations governing the ALJ's deliberation state that:

> Generally, [the ALJ] give[s] more weight to opinions from [a claimant's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). The treating physician's opinion on the nature and severity of the patient's impairment is generally given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Id.*

Where the ALJ assigns less than controlling weight to the treating physician's opinion, he is required to provide "good reasons" for doing so. *Id.* ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); *see also Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (upholding these regulations as valid and binding on the courts). In deciding how much weight to give the opinion, the ALJ must consider "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)).

Here, the ALJ gave Dr. Nidhiry's opinion "very limited weight" because there were "no treating notes to support her conclusions, or statements of any tests confirming [Sanfilippo]'s problems" and because Dr. Nidhiry did not respond to the ALJ's or Sanfilippo's subpoenas for such notes. (Admin. R. at 61.)

First, the fact that Dr. Nidhiry's notes were not part of the record may not be held against Sanfilippo, especially not to an extent that requires disregarding the opinion of his treating physician entirely. Even when a claimant is represented by counsel, it is the duty of the ALJ to ensure that the medical record is complete. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). Simply issuing a subpoena for such records is not enough to fulfil this duty. *Williams v. Barnhart*, No. 05-CV-7503, 2007 WL 924207, at *7 (S.D.N.Y. Mar. 27, 2007). The ALJ was required to enforce the subpoena as well. *Id.*; *see also Suriel v. Comm'r of Soc. Sec.*, No. 05-CV-1218, 2006 WL 2516429, at *4 (E.D.N.Y. Aug. 29, 2006) (finding that "merely twice requesting medical reports from treating physicians" was insufficient as the ALJ was required to "enforce subpoenas requiring the production of evidence").

Second, the three reports that were submitted by Dr. Nidhiry were clearly based on clinical findings of psychiatric abnormalities, nine or ten examinations, as well as Sanfilippo's recitation of his symptoms. (Admin. R. at 334–35.) The fact that there were no "tests confirming [Sanfilippo]'s problems," as the ALJ found, does not undermine Dr. Nidhiry's medical opinion. *See Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (finding that "[a] patient's report of complaints, or history, is an essential diagnostic tool." (quoting *Flanery v. Chater,* 112 F.3d 346, 350 (8th Cir.1997)); *Polis v. Astrue*, No. 09-CV-379, 2010 WL 2772505, at *10 (E.D.N.Y. July 13, 2010). While the regulations state that symptoms alone are not enough to establish a mental impairment, "[p]sychiatric signs . . . e.g. abnormalities of behavior, mood, thought, memory, orientation, development, or perception" are enough to establish a mental impairment. 20 C.F.R. § 416.928. Dr. Nidhiry's reports describe precisely those psychiatric signs. (Admin. R. at 334.)

Also significant is the fact that the ALJ gave consultative examiner Dr. Alexander's opinion "substantial weight [] although he is a non-treating physician who examined [Sanfilippo] only on one occasion" and "did not review the medical evidence in the file." (*Id.* at 61.) Not only did Dr. Alexander not review the medical records, but he, like Dr. Nidhiry, did not perform any lab tests. Nonetheless, the ALJ found that "[Dr. Alexander's] examination was thorough, he is an impartial examining physician, and he is familiar with the Social Security Administration's rules and regulations for determining disability." (*Id.*) This is wholly insufficient reasoning for giving controlling weight to the report of a consultative examiner over that of a treating physician. The ALJ points to no inconsistencies in the record and provides no "good reasons" for this determination as required by 20 C.F.R. § 404.1527(c)(2).[3]

"Remand is particularly appropriate where the reviewing court is unable to fathom the Commissioner's rationale in relation to the evidence in the record without further findings or explanation for the decision." *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997). Thus, the Court must remand for further consideration of this issue.

## II.     New Evidence Submitted to the Appeals Council

In support of his claim for disability, plaintiff submitted new evidence for the Appeals Council's review. The regulations direct the Appeals Council to consider "new and material evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). "Evidence is 'new' if it was not considered by the ALJ and is 'not merely cumulative of what is already in the record,' and it is 'material' if it 'is both relevant to the claimant's condition during the time period for which benefits were denied

---

[3] While the Commissioner's briefing attempts to explain the ALJ's determination at this step, (Def.'s Mem. at 20), the ALJ made no such findings in his decision and the Court will "'not accept appellate counsel's post hoc rationalizations for agency action.'" *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

and probative.'" *Sistrunk v. Colvin*, No. 14-CV-3208, 2015 WL 403207, at *7 (E.D.N.Y. Jan. 28, 2015) (quoting *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991)). "Materiality also requires 'a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide the claimant's application differently.'" *Id.* (quoting *Jones*, 949 F.2d at 60).

In this case, the Appeals Council erred in its determination that certain evidence did not relate to the time period at issue. However, it did not err in its formal exclusion of that evidence from the administrative record. Specifically, Dr. Nidhiry's letter and Dr. Sherman's reports *do* contain information about the relevant time period. While Dr. Nidhiry's letter was written more than a year after the ALJ's decision and contains some information that post-dates the decision, it does contain information that relates back to 2010. (Admin. R. at 6–7.) Similarly, Dr. Sherman's reports, completed seven months after the ALJ's decision, relate to the time period at issue. (*Id.* at 47 (finding the severity of Sanfilippo's mental illness had existed since April 2011).) *See Farina v. Barnhart*, No. 04-CV-1299, 2005 WL 91308, at *5 (E.D.N.Y. Jan. 18, 2005) ("The requirement to review new evidence, however, hinges on whether the report relates to the period on or before the ALJ's decision, and not to the date of the report itself.").

Nevertheless, this evidence was properly excluded as it is cumulative of the information included in the record and thus not "new." Dr. Nidhiry's letter explicitly summarizes the information she submitted to the ALJ and the findings therein. Likewise, Dr. Sherman's reports were based on information before the ALJ and Sanfilippo's self-reported complaints. Dr. Sherman noted that he only once examined Sanfilippo and the examination occurred seven months after the relevant time period. (*Id.* at 37.) Thus any new findings would be beyond the relevant period. Because the evidence cannot be considered "new," the Appeals Council did not fail to adequately consider new and material evidence. However, the Court notes that this

conclusions is qualified.  To the extent the ALJ discredited Dr. Nidhiry's findings based on the

absence of treatment records, the Appeals Council erred in failing to consider the records "new."

In light of the Court's remand for further consideration of Dr. Nidhiry's opinion under the

treating physician's rule, this is of no moment here.

### III.    The ALJ's Evaluation of Sanfilippo's Credibility

It is within the ALJ's discretion to "evaluate the credibility of a claimant and to arrive at

an independent judgment, in light of medical findings and other evidence," regarding the true

extent of a claimant's alleged symptoms.  *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).

Where the ALJ rejects a plaintiff's testimony in light of objective medical evidence and other

factors he deems relevant, he must explain that decision "with sufficient specificity to enable the

[reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief" and

whether his decision is supported by substantial evidence.  *Calzada v. Astrue*, 753 F. Supp. 2d

250, 280 (S.D.N.Y. 2010) (quoting *Fox v. Astrue*, No. 6:05-CV-1599, 2008 WL 828078, at *12

(N.D.N.Y. Mar. 26, 2008)).

From a review of the record, it does not appear that the ALJ made an express credibility

finding.  The ALJ classified Sanfilippo's hospitalization for depression as brief and

undocumented, his outpatient mental health treatment as intermittent, and repeats the findings

from Sanfilippo's consultative examination.  It does not appear that the ALJ found Sanfilippo not

credible so much as he simply disregarded any statements that were not confirmed by Dr.

Alexander based on their single interaction.

The ALJ found Sanfilippo suffered from major depressive disorder, but did not decide

whether that impairment could reasonably be expected to produce the symptoms described by

Sanfilippo.  (Admin. R. at 57.)  Further, some of the ALJ's recitation of Sanfilippo's activities of

daily living are inconsistent with the evidence. The ALJ wrote that Sanfilippo spends his time "socializ[ing] with his friends." (*Id.*) However, the Function Report he cites to states that Sanfilippo "used to . . . socialize with his friends however due to his depression and his symptoms of anhedonia he no longer engages in these activities." (*Id.* at 170.) Further, the closest Sanfilippo's testimony comes to describing his ability to socialize are his statements that he "sometimes" has trouble getting along with people. (*Id.* at 80.) Likewise, the ALJ wrote that Sanfilippo can "take public transportation independently." (*Id.* at 57.) While the Functional Report cited previously notes that Sanfilippo can go out alone, this may be best explained by Sanfilippo's testimony that he is able to go for walks alone and that, while he is "sometimes" able to travel by himself on public transportation, he frequently has anxiety attacks among large, and often small, groups of people making him unable to take public transportation alone. (*Id.* at 77, 81, 172.) Moreover, Sanfilippo's treating psychiatrist found that he was markedly limited in his ability to travel to unfamiliar places or use public transportation. (*Id.* at 338.) Further, Sanfilippo arrived by train "accompanied by his father" to see the consultative examiners and to attend the hearing. (*Id.* at 77, 307.)

"[T]he ALJ must not only develop the proof but carefully weigh it." *Donato v. Sec'y of Dep't of Health & Human Servs. of U.S.*, 721 F.2d 414, 419 (2d Cir. 1983). In light of the ALJ's failure to make an express credibility finding against Sanfilippo and explain why his testimony was, at least in part, discredited, the Court cannot conclude that the ALJ's findings are supported by substantial evidence. *See id.* at 420. As such, this issue is remanded for further consideration and an explanation of any credibility findings made against Sanfilippo.

## IV.    Adequacy of the Vocational Testimony[4]

Sanfilippo argues that the ALJ erred in relying on vocational expert testimony in direct conflict with the Dictionary of Occupational Titles ("DOT").  As detailed above, the ALJ asked the vocational expert about jobs that could be performed by a hypothetical individual who "can remember and understand and carry out simple instructions, make simple work-related decisions . . . ."  (Admin. R. at 86.)  The vocational expert testified that an individual with the limitations found by the ALJ could work as a cleaner, a kitchen helper, or a meat clerk.  (*Id.* at 87.)  After the hearing, Sanfilippo's counsel objected on the grounds that each of these jobs have a reasoning level of two in the DOT.  (*Id.* at 341; Pl.'s Mem. at 20.)  Under Appendix C of the DOT, a reasoning level of two requires the "[a]bility to apply commonsense understanding to carry out detailed but uninvolved written or oral instructions."  DOT App. C, 1991 WL 688702.  However, the ALJ's hypothetical most closely fits the description for reasoning level one under the DOT, which requires the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions."  *Id.*; *Pettaway v. Colvin*, No. 12-CV-2914, 2014 WL 2526617, at *12 (E.D.N.Y. June 4, 2014).

 "While it may be acceptable under certain circumstances for an ALJ to rely on a vocational expert's testimony that conflicts with the DOT," in such cases the ALJ must "explain and acknowledge" the conflict.  *Pettaway*, 2014 WL 2526617, at *12.  In his decision, the ALJ found counsel's argument "unpersuasive as these jobs are classified as simple level 1 or 2 jobs and if the claimant retains the ability to make simple work-related decisions, without any other limitations the claimant's psychiatric condition would be considered non-severe."  (Admin. R. at 62.)  This explanation is insufficient in light of the (i) ALJ's own determination that plaintiff

---

[4] Sanfilippo's argument that the ALJ erred in relying on vocational expert testimony in response to a hypothetical RFC that is not based on substantial evidence, (Pl.'s Mem. at 20.), is not addressed in light of the Court's decision to remand the case for further consideration of Dr. Nidhiry's opinion and Sanfilippo's testimony.

could only understand and carry out simple instructions, (*Id.* at 86); (ii) the evidence that Sanfilippo had to stop working at his previous two jobs because he could not remember how to do them, (*Id.* at 84–85, 75); (iii) Dr. Belsky's findings of moderate limitations in Sanfilippo's ability to understand and remember detailed instructions, (*Id.* at 327); and (iv) Dr. Nidhiry's findings of marked limitations in Sanfilippo's ability to understand one or two step instructions and detailed instructions, (*Id.* at 336).

The ALJ's insufficient explanation of the conflict between the vocational expert's testimony and the DOT – a conflict that the vocational expert did not appear to be aware of – provides yet another basis for remanding. Moreover, where other courts "have held that an RFC that limits a claimant to only simple and routine tasks *is* consistent with [] level 2 reasoning," *Rivera v. Colvin*, No. 11-CV-7469, 2014 WL 3732317, at *42 (S.D.N.Y. July 28, 2014), where it appears the conflict may be a "mistake" by the vocational expert, *Jasinski v. Barnhart,* 341 F.3d 182, 186 (2d Cir. 2003); *Santos v. Astrue*, 709 F. Supp. 2d 207, 212 (S.D.N.Y. 2010), or the deviation is not sufficiently explained or acknowledged by the ALJ, *Pettaway*, 2014 WL 2526617, at *12, the issue is properly remanded.

## CONCLUSION

For the reasons herein, plaintiff's motion for judgment on the pleadings is granted,

defendant's motion for judgment on the pleadings is denied, and the case is remanded for further

analysis on Dr. Nidhiry's medical opinion, Sanfilippo's credibility, and the discrepancy between

the vocational expert's testimony and the DOT.

The Clerk of Court is directed to enter judgment accordingly and close the case.


SO ORDERED.

Dated: Brooklyn, New York
          March 27, 2016

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge